UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ALENA CLARK,

      Plaintiff,
                                        Case No. 19-10106
                                        Honorable Thomas L. Ludington

v.

COUNTY OF SAGINAW,
et al.,

      Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On January 11, 2019, Plaintiff, Alena Clark, a former Assistant Prosecuting Attorney ("APA") for Saginaw County filed a complaint against Defendants John McColgan, the elected Prosecutor for Saginaw County, Chris Boyd, a former APA, and the County of Saginaw. Plaintiff alleged in Count I that all Defendants violated the Michigan Elliot-Larsen Civil Rights Act because "gender was at least one factor that made a difference in Defendants' decision to pay Plaintiff less, terminate Plaintiff, and treat her differently than similarly situated male employees." ECF No. 1 at PageID.6. In Count II she contends that all Defendants retaliated against her for "opposing violations of the Elliott-Larsen Act." *Id.* at PageID.7. Count III identifies a claim under 42 U.S.C. § 1983 and the First Amendment alleging Defendants McColgan and Boyd terminated her employment because of her "speaking out against gender discrimination." *Id.* at PageID.8–9. Count IV alleges a claim under 42 U.S.C. § 1983 and the Fourteenth Amendment against McColgan and Boyd for treating her differently "than similarly situated APA's." *Id.* at PageID.9–10. Count V is brought against the County of Saginaw under the Equal Pay Act alleging that she

was promoted to the classification of APA II but was not "paid commensurate with the position, such as similarly situated male APA's." *Id.* at PageID.10–11.

The case management and scheduling order was extended twice. ECF Nos. 9, 24, 27. Discovery closed on April 18, 2020. However, discovery was extended until May 11, 2020 and then later to May 15, 2020, to provide for five depositions that were noticed prior to the April 18, 2020 discovery deadline. ECF Nos. 33, 47.

Multiple discovery issues have been addressed by court order, including Plaintiff's and Defendants' motions to compel supplementary discovery which were denied (ECF Nos. 29, 32, 34, 35, 36, 58). An order was entered compelling Defendant McColgan's deposition on May 11, 2020 as well as setting procedures for remote depositions. ECF Nos. 43, 47. Plaintiff's motion for attorney fees was granted in part. ECF No. 70.

On June 4, 2020, Defendants filed a motion for summary judgment. ECF No. 62. Response and reply briefs were timely filed. ECF Nos. 65, 68.

## I.

## A.

Alena Clark was hired as an APA on February 2, 2016 for Saginaw County. ECF No. 62-7 at PageID.1466. She worked as an APA for two years until her employment was terminated on August 29, 2018. ECF No. 65-2 at PageID.1732. During Plaintiff's tenure, there were multiple supervisors in the Prosecutor's office. John McColgan was the elected Prosecutor in Saginaw County at the time of Clark's employment and remains the Prosecutor today. ECF No. 62 at PageID.1414. Christopher Boyd was the Chief Assistant Prosecuting Attorney from January 2013 until his retirement in September 2018. ECF No. 62-7 at PageID.1465. Mark Gaertner was the interim Chief Assistant Prosecuting Attorney when Boyd was on medical leave and later became

Chief Assistant Prosecuting Attorney after Boyd's retirement. ECF No. 62-9 at PageID.1482. Blair Stevenson was the interim Deputy Chief Assistant Prosecuting Attorney when Boyd was on medical leave and resumed the job duties full-time after Boyd's retirement. ECF No. 62-10.

**B.**

**i.**

The Saginaw County Prosecuting Attorneys Collective Bargaining Agreement, as it appears relevant to this case, provides as follows,

Section 2.3 – Prosecutor Rights

The Prosecuting Attorney retains all rights provided by law which includes but are not limited to those listed here:

> (b) To hire and discharge Employees covered by this Agreement at will. . . .
>
> (c) To promote, discipline or suspend Employees covered by this Agreement . . .
>
> (g) To select Employees for Promotion without regard to seniority.
>
> (h) To make judgments regarding skill, ability, qualifications and competence of Employees.

Section 2.4 – County Rights
. . .

The County has exclusive rights to determine the number of Assistant Prosecuting Attorneys in each classification, and to increase or decrease the number of Employees retained.

. . .

9.2 – Rates of Pay and Number of Prosecutors Per Classification

The Saginaw County Board of Commissioners has the sole authority to determine the number of Assistant Prosecuting Attorneys and the number in each classification level.

The Prosecuting Attorney has the sole authority to determine where each Employee shall be classified, limited to the number of assistant prosecuting attorneys

budgeted in each classification, subject only to the initial implementation of Section 9.3.

The Prosecuting Attorney reserves the right to, at any time, reassign any Employee's classification or step level within the limitations in this Article. However, no Employee's compensation level shall be reduced during the term of this Agreement.

Section 9.3 – Initial Placement and Movement in Salary Grid of Existing Employees:

Effective each subsequent anniversary date, the employee shall be moved to the next higher Step level and be paid at his or her salary rate for the applicable year as reflected in Schedule A, except as [otherwise provided].

Any employee who is promoted from his or her initial classification shall be paid at the next step level in the new classification that is at least 5% above the salary being received immediately before the promotion.

Any employee who is classified at Step 1 shall move to Step 2 six months after his or her anniversary date and to Step 3 one year after his or her anniversary date. Further step increases shall occur annually thereafter in accordance with the terms of this Article.

. . .

9.7 – Implementation of Step Increases

All step increases provided for in this agreement shall take effect on an Employee's anniversary date except as forth below.

If the Prosecuting Attorney determines that an Employee's work performance is not satisfactory, he/she shall inform the Employee, the Union and the County's Personnel Office of this in writing, including the reasons therefor, no later than 30 days prior to the Employee's anniversary date that would result in a step increase. The step increase may then be postponed for up to ninety (90) days to provide the Employee an opportunity to improve his/her work performance. At or before the end of that time, the Employee shall receive the step increase if adequate improvement has been made.

ECF No. 62-2 at PageID.1447–50. A copy of Schedule A was not included by either party.

The facts, as best they can be learned from the parties' papers will be summarized hereafter.

However, it is important to note that the only document relating to the employment practices of

the Saginaw County Prosecutors office furnished to the Court is the Collective Bargaining Agreement ("CBA"). The witness statements refer to a number of additional terms which are not defined and upon which there appears to be little agreement. APA I and APA II appear to be two employee classifications for the Prosecutors office created by the County Commissioners under Section 9.2 of the CBA. However, no definitions or governing criteria for the two classifications are provided. There is no explanation of what the expected rate of progression would be or the relationship between the employee's classification and the employee's compensation. There is no explanation about the relationship between the classifications and the "step" compensation increases provided for under Section 9.3 of the CBA that are annual and automatic. There is also no explanation about how promotions would occur, how the fact of the promotion would be recorded or how the employee would be informed of the promotion. Finally, a number of witnesses refer to the term "docket attorney," again without definition and little consensus. Some refer to it as a permanent status of certain APAs, some refer to it as a temporary assignment of status. No one explains how the status relates to the employee's CBA classification or compensation. Nevertheless, the evidence summarized by the parties appears sufficient to address the Defendants' motion for summary judgment.

**ii.**

On January 29, 2018, Clark was moved to "an APA II position, but remain[ed] as an APA I payscale." ECF No. 62-4 at PageID.1457. McColgan testified that moving Clark from an APA I to APA II "was most likely the result of a conversation between [ ] Boyd and myself." ECF No. 62-3 at PageID.1454. Clark did not learn about the reclassification until after her termination. ECF No. 62-8 at PageID.1474. Boyd and McColgan averred that Clark was not "promoted" from APA I to APA II, but simply was assigned an APA II PCN without further explanation. ECF No. 62-7

at PageID.1467; ECF No. 62-19 at PageID.1589. McColgan further testified and Boyd concurred that sometimes an employee's "personnel number" could be moved from an APA I to APA II classification, even though the employee was not officially promoted "to keep the II's occupied so the [County] Board [of Commissioners], if they were trying to take something away wouldn't try and take a II because someone was in it." ECF No. 62-3 at PageID.1454; ECF No. 62-7 at PageID.1466. Boyd averred that "Reassigning [Personnel status change numbers] between APA I and APA II is not a promotion nor a demotion but merely for personnel tracking and accounting purposes," again, without further explanation. ECF No. 62-7 at PageID.1466.

The same process occurred for APA Daniel Van Norman and APA Melissa Hoover. ECF No. 62-5 at PageID.1459, 1460; ECF No. 65-11 at PageID.1878. Boyd also proffered that Attorneys Kanuszewski, Reimers, Ruffin, Sawka, Stevenson, Baker, and VanNorman were also APA Is in fact but had APA II PCN designations. ECF No. 62-7 at PageID.1467. The only additional information furnished is a spreadsheet that appears to have been created by Defendants. *See* ECF No. 65-12. Some limited, but additional information is provided regarding APA Stevenson and APA Reimers.

Defendants note that Blair Stevenson was reclassified to an APA II PCN and received APA II compensation for a few months at the end of 2014, even though he remained classified as an APA I. McColgan testified that it was intended as a workaround to provide an end of year bonus for Stevenson, with the understanding that his compensation and classification status would return to APA I at the beginning of the following year. ECF No. 65-4 at PageID.1841. However, Stevenson's compensation could not be decreased once it was increased under the CBA. Therefore, despite Defendants' frustrations, he retained the APA II compensation and classification but as an APA I. ECF No. 65-4 at PageID.1841–42. Mr. Reimers personnel status change notice states that

he was "changed from" APA I to APA II with a commensurate compensation increase, but he was to retain his PCN number. EFC No. 65-10 at PageID.1875. It is unclear from the notice if Mr. Reimers' PCN was assigned to classification status APA I or APA II.

There are no set criteria for promoting an APA from APA I to II (as compared to the apparent administrative process for changing an attorney's PCN from APA I to APA II). McColgan testified that they look at "[c]ases tried, how [attorneys] handle their cases, amount of cases, ab[ility] to function in the office without drama." ECF No. 62-3 at PageID.1453.

## C.

There are three main categories of Clark's behavior that were criticized by her supervisors and colleagues and, according to Defendants, led to her termination. First, her relationship with former APA Kanuszewski. Second, her role in instigating or continuing an office conflict, including bullying other APAs. Finally, her mismanagement of a major felony case.

## i.

Clark is a personal friend of APA Michael Kanuszewski, who has an unspecified pending employment suit against Saginaw County. On June 29, 2018, Clark testified that she saw Boyd enter Kanuszewski's office (while Kanuszewski was out of the office, but not yet terminated) and that she texted Kanuszewski to inform him that Boyd was in his office. ECF No. 62-7 at PageID.1468. She offered to take any personal items to Kanuszewski after he was suspended. *Id.* After this event, Boyd averred that he believed Kanuszewski "had been using his relationship with Ms. Clark to gather information regarding management's handling of his employment matter . . . . [and] concluded that Ms. Clark could no longer be trusted." ECF No. 62-7 at PageID.1468. McColgan reached the same conclusion. ECF No. 62-19 at PageID.1590.

In an effort to discuss Kanuszewski's employment status with all of the APAs, Boyd convened a meeting of the APAs on August 14, 2019. ECF No. 62-7 at PageID.1470. An attendance sheet was circulated. ECF No. 62-7 at PageID.1470. During the meeting, Clark asked fellow APA Nate Collision about the attendance sheet. ECF No. 62-7 at PageID.1470. Clark testified that she spoke at a "whisper." ECF No. 65-2 at PageID.1767. Boyd averred that when he "stopped talking and asked Collison if there was a problem[,] Mr. Collison responded that Ms. Clark had a question about the intention and purpose for the sign-in sheet [and] apologized for the interruption." ECF No. 62-7 at PageID.1470. Boyd averred Clark interrupted him a second time and volunteered in response to his question that she had heard everything he had said. ECF No. 62-7 at PageID.1470; ECF No. 62-11 at PageID.1493. Boyd then prompted Clark to repeat what he said and after "provid[ing] an incomplete response [he] interjected, with 'and?' prompting her to continue." ECF No. 62-7 at PageID.1470; ECF No. 62-11 at PageID.1493. Clark testified that Boyd "kept getting louder and more aggressive" throughout the conversation. ECF No. 65-2 at PageID.1769. Boyd averred he "did not ask Mr. Collison to reiterate what I said, because I was able to reiterate my points through Ms. Clark's responses and because Mr. Collision did not indicate that he heard every word." ECF No. 62-7 at PageID.1470. Boyd averred that Clark's "reaction" at the meeting "confirmed that she was disgruntled regarding the handling of the Kanuszewski matter and aware that I knew she was communicating with Kanuszewski about matters transpiring in the Prosecutor's office." ECF No. 62-7 at PageID.1470. Collison later averred that "Boyd addressed the interruption by speaking to both of us." ECF No. 62-25 at PageID.1673.

In late August, an unidentified APA informed McColgan that Clark's vehicle was located at Kanuszewski's residence. ECF No. 65-4 at PageID.1826. McColgan testified that he never

spoke with Clark about her visits with Kanuszewski or his concerns about her not following directions. ECF No. 65-4 at PageID.1826.

### ii.

APA Gaertner stated in his affidavit that:

> Clark was a bully who alienated and demeaned fellow APA's. I learned that Ms. Clark was regularly bullying and demeaning Jolina O'Berry, Dan Pollard, Drew Sauter, Daniel Straka, and Melissa Hoover. [ ] I learned that Ms. Clark was attempting to remove or reassign files that I had assigned to various APA's, inferring that the assigned APAs were not competent to handle the files. [ ] I learned that Ms. Clark had directed various police personnel not to take to [sic] warrants to certain APA's, because they were incompetent. [ ] Ms. Clark was angry and disgruntled regarding management's handling of the Michael Kanuszewski employment matter.

ECF No. 62-9 at PageID.1484. Stevenson's affidavit includes the same allegations against Clark—she was a bully, demeaned APAs Hoover, Pollard, Sauter, and O'Berry, interfered with police personnel on warrants, attempted to reassign files, and became disgruntled regarding Michael Kanuszewski's employment matter. ECF No. 62-10 at PageID.1490. McColgan's affidavit averred that Clark was a bully, especially regarding Jolina O'Berry and "interjected herself into management issues involving APA Trevis Ruffin and Shrondra Clement." ECF No. 62-19 at PageID.1589.

O'Berry averred that she made a plea bargain offer in one of Clark's cases without speaking with Clark first and that afterward Clark did not speak to her for months and bullied her. ECF No. 62-14. Specifically, O'Berry stated that Clark monitored her communications with management, advised O'Berry that she believed two other APAs were incompetent, and notified police detectives to avoid giving files to certain APAs. ECF No. 62-14. Clark, on the other hand, testified that O'Berry walked into a meeting between Clark and her divorce attorney without invitation, Clark apologized that she couldn't speak with O'Berry at the moment, and she later avoided

O'Berry at the direction of Mark Gaertner. ECF No. 65-2 at PageID.1729. Clark admits that she informed management that O'Berry "was being disruptive and it was difficult to get [her] work done." ECF No. 65-2 at PageID.1756.

**iii.**

Clark was assigned Defendant Troy McClain's felony assault case in November of 2017. McClain was charged with assault with intent to commit great bodily harm. ECF No. 62-9. Gaertner averred that Clark agreed to waive the preliminary exam, thereby failing to preserve the victim's testimony, against his advice. ECF No. 62-9. Stevenson averred that Clark failed in her handling of the case.

> She disregarded management's directive to conduct a preliminary examination which later created evidentiary problems when the witness was hesitant to testify. She attempted to dismiss the case after being told that a trial and conviction was mandatory. She proposed a ridiculously low sentence cap to evoke a plea demonstrating her hesitancy to take the case to trial.

ECF No. 62-10 at PageID.1488. Boyd testified he assigned the case to Clark because she wanted "to get some experience on a major crime." ECF No. 62-11 at PageID.1494. Gaertner and Boyd were displeased with Clark agreeing to waive the preliminary exam and have the case bound over to Circuit Court "without preserving the wife's testimony." ECF No. 62-11 at PageID.1494. Boyd testified he believed "we had explained to [Clark] that part of becoming a trial attorney in serious cases is to be able to manage your witnesses and to be able to deal with evidentiary issues." ECF No. 62-11 at PageID.1495.

Additionally, Clark offered a two-year sentencing ceiling or cap on Mr. McClain's case, which was rejected by the Circuit Court Judge. ECF No. 62-11 at PageID.1497-1498. Boyd testified that Clark did so despite the fact that he had informed her a two-year sentencing cap was unacceptable and that the Judge would not accept it. ECF No. 62-11 at PageID.1496-97. Clark

testified that she never received any direction that a two-year sentencing cap was unacceptable. ECF No. 65-2 at PageID.1758. Ultimately, APA Stevenson assumed prosecution of the case. ECF No. 62-11 at PageID.1498.

**iv.**

Clark believes she was promoted to APA II because she became a docket attorney and was moved to an APA II PCN. As noted earlier, she does not define the term "docket attorney," explain what the criteria are, or state who made the decisions to assign docket attorney status. Clark testified that a docket attorney "is a person who most consistently handles the judge's docket." ECF No. 65-2 at PageID.1735. She also testified that she "do[es]n't think" an APA I can be selected as a docket attorney. *Id.* However, she testified that it was her belief based on the fact that "[i]t was always a II that was appointed as a docket attorney." Boyd testified that he believed the term "docket attorney" was a misnomer. ECF No. 65-3 at PageID.1807. He explained "[w]hat we did have was the circuit court miscellaneous matters sheet or circuit court calendar. The APAs conveniently called it a docket attorney because they may be called upon to go to a circuit court judge's courtroom for a Monday morning and handle everything that was on the docket." *Id.* Generally, the more experienced attorneys would handle the miscellaneous matters. *Id.*

Clark testified that she was the only APA I who was assigned as a "regular" docket attorney. ECF No. 65-2 at PageID.1735. McColgan testified that Boyd, Stevenson or Mark Gaertner assigned Clark as docket attorney for Judge Trice. ECF No. 65-4 at PageID.1842. According to Clark, APA Is could fill in for docket attorneys, but were not assigned as a regular or primary docket attorney. ECF No. 65-2 at PageID.1735. A chart provided by Defendants demonstrates that the majority of primary docket attorneys were compensated as APA IIs. ECF No. 62-12. In 2016 and 2017, attorneys paid at the APA I rate were docket attorneys between one

and three times of the year. However, there were two exceptions, APAs Joe Albosta and Demond Tibbs. Albosta was the primary docket attorney in courtroom C1 in 2016 and courtrooms C3 and P1 in 2017. Additionally, Tibbs was a docket attorney for 12 weeks in 2016 and 3 weeks in 2017 before he was promoted to the APA II compensation schedule. *Id.*

The pattern changed in a minor way in 2018. APA I attorneys filled in as docket attorneys between three and thirteen weeks per year. Two APA Is were assigned as docket attorneys three times. Three attorneys were assigned as docket attorneys five times, including Ms. Clark. One attorney was assigned as a docket attorney nine times and one attorney thirteen times. *Id.* However, the permanent status docket attorneys were always paid at the APA II rate of compensation. *Id.*

### D.

After Defendant Boyd's August 14 meeting to discuss Mr. Kanuszewski, Clark concluded that she was singled out for questioning because she was a woman since Dan Pollard and Nate Collison, male APAs, were not. ECF No. 65-2 at PageID.1773. She met with a Human Resources ("HR") representative the same week and explained that she felt targeted by Boyd because she was female. ECF No. 62-22 at PageID.1653–54. Clark had two meetings with HR personnel – one on August 14 and a second on August 15. ECF No. 65 at PageID.1700. From the record, it appears that Clark informed one, but not both, HR employees that she believed she was being discriminated against because of her gender. ECF No. 62-23 at PageID.1665–66; ECF No. 65-2 at PageID.1777–79. On the evening of August 14, Clark prepared a document summarizing her August 14 Kanuszewski meeting. ECF No. 62-22 at PageID.1647–48. She never furnished the document to HR or Prosecutor McColgan.

After meeting with HR, Clark met with McColgan. ECF No. 62-22 at PageID.1659. Clark testified that she informed McColgan that she thought Boyd believed Clark was going to divulge

confidential information to Kanuszewski which is "why initially he started yelling at me. But when he proceeded to continue to talk to me like I was a child, it was because I was a woman." ECF No. 62-22 at PageID.1659–60. She informed McColgan that she was not interested in pursuing the issue because Boyd was retiring, provided she "would be left alone" in the interim. ECF No. 62-22 at PageID.1661. Ultimately, Clark testified she never followed-up with HR because she was fired. ECF No. 65-2 at PageID.1775. In response to the question "[b]efore Alena Clark came to you on August 20th to have that meeting, you had not decided to fire her, correct?" McColgan testified, "I don't think so." ECF No. 65-4 at PageID.1823.

McColgan averred that he was informed Clark felt "embarrassed" during the August 14 meeting, but she "advised [him] that she was aware of Boyd's pending retirement and therefore did not want to pursue any form of complaint." ECF No. 62-19 at PageID.1590–91. McColgan concluded, after speaking with Boyd and an APA,[1] that Clark's "conduct at the meeting [was] consistent with her disgruntled attitude regarding [his] handling of the Kanuszewski employment matter." ECF No. 62-19 at PageID.1591. Boyd explained that he knew Clark spoke with McColgan about the August 14 meeting, but did not know the details of the conversation. ECF No. 62-7 at PageID.1470.

Boyd and McColgan averred that they were not aware that Clark spoke with Human Resources until after the instant case was filed. ECF No. 62-7 at PageID.1470; ECF No. 62-19 at PageID.1591.

**E.**

Clark was ultimately terminated on August 29, 2018. ECF No. 65-2 at PageID.1732. McColgan averred that he fired Clark

---

[1] McColgan does not identify which APA in his affidavit.

because she was disloyal and spying on management. She was disgruntled over my
handling of the Kanuszewski employment matter. She was bullying and alienating
fellow APAs. She was not following directives from the Deputy Chief Assistant.
The Chief Assistant and Deputy Chief Assistant reported that her attitude and
conduct was detrimental to office moral and the office environment.

ECF No. 62-19 at PageID.1592. Clark testified that McColgan informed her it was not working

out when she was fired. ECF No. 65-2 at PageID.1785. No adverse employment actions were taken

against Clark prior to her termination. ECF No. 65-2 at PageID.1754.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the

record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party

who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all

reasonable inferences in favor of the non-movant and determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Id.* at 251–52.

## III.

### A.

In Count I, Plaintiff alleges that Defendants discriminated on the basis of her sex in

violation of the Michigan Elliott-Larsen Civil Rights Act. In Count IV Plaintiff alleges that

Defendants violated her Fourteenth Amendment right to equal protection under 42 USC § 1983.

The two claims are analyzed applying the same legal framework. *Smith v. City of Salem, Ohio*,

378 F.3d 566, 577 (6th Cir. 2004) ("[T]he showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section § 1983."); *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652–53 (6th Cir. 2012) ("[C]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases.").

### i.

The Michigan Elliott-Larsen Civil Rights Act ("ELCRA") provides in relevant part:

An employer shall not do any of the following:

> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex . . .

> (b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of . . . sex . . .

> (c) Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system.

M.C.L. § 37.2202.

The Equal Protection Clause of the Fourteenth Amendment states "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." 42 U.S.C. § 1983 provides a means for an individual to seek redress against a person who, under color of law, violates their Constitutional rights. In this case, Plaintiff alleges that Defendants violated her Fourteenth Amendment right to equal protection under the law by discriminating against her on the basis of sex. Under either Title VII or § 1983, "the plaintiff must establish by a preponderance of the evidence that she was the victim of intentional or purposeful discrimination." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988). "[A] plaintiff is required to demonstrate that the adverse

employment decision would not have been made 'but for' her sex. Put differently, the plaintiff must show that the 'discriminatory intent more likely than not was the basis of the adverse employment action.'" *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) (internal citation omitted). "The Equal Protection Clause of the Fourteenth Amendment 'protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights.'" *Davis v. Prison Health Services*, 679 F.3d 433, 438 (6th Cir. 2012) (citing *Scarbrough v. Morgan Cty. Bd. of Education*, 470 F.3d 250, 260 (6th Cir. 2006)). "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Board of Commissioners*, 430 F.3d 783, 788 (6th Cir. 2005).

Discriminatory treatment can be established by direct evidence or indirect and circumstantial evidence. *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 192–93 (Mich. 2003). The Michigan Supreme Court defined direct evidence as "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quotations omitted). The court further held "[i]n a direct evidence case involving mixed motives, i.e., where the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor in the decision." *Id.*

A plaintiff may also prove sex discrimination by presenting indirect evidence under the burden-shifting approach as articulated in *McDonnell Douglas*. *McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Sniecinski*, 666 N.W.2d at 193. To establish a prima facie case, the plaintiff must establish that "(1) she belongs to a protected class, (2) she suffered an adverse employment action,

(3) she was qualified for the position, and (4) her failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination." *Sniecinski*, 666 N.W.2d at 193. A plaintiff can satisfy the fourth element by demonstrating that she was "treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).

"If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory rationale for the adverse employment action." *In re Rodriguez*, 487 F.3d 1001, 1008 (6th Cir. 2007). "Once the employer does so, the burden shifts back to the plaintiff to demonstrate that the articulated reason is a mere pretext for discrimination." *Id.* Pretext may be demonstrated by "showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

## ii.

Plaintiff's claims for violation of the Equal Protection Clause are predicated on the fact that she "was treated differently than similarly situated male APA's during her employment based on her gender." ECF No. 1 at PageID.10. Defendants do not dispute that Plaintiff is part of a protected class. She alleges in her response that the adverse employment action at issue for this claim was the disparity of her compensation in comparison to male APAs. ECF No. 65 at PageID.1720–21 ("she can prevail under her pay discrimination claims by establishing an inference of discrimination using 'the burden-shifting framework first set forth in *McDonnell Douglas v. Green*'").

Plaintiff does not provide a separate factual assertion for her equal protection claim, instead relying on her arguments in the Equal Pay Act section of her brief for her justification. ECF No. 65 at PageID.1721. Plaintiff appears to argue that she is qualified to be paid the APA II salary because "there is a factual dispute whether being promoted is a necessary prerequisite to APA II pay" due to the fact that "[a]t least [two] male APA Is were 'reclassified' but not promoted to APA II and received APA II pay." ECF No. 65 at PageID.1719. However, according to Defendants, Blair Stevenson's reclassification was not intended to be permanent, but rather meant to manipulate a one-time bonus for him. As for APA Reimers, it is unclear if he had an APA I or APA II PCN classification at the time of his promotion or if he received a pay increase.

Plaintiff further argues that "her skills were never questioned or criticized, that she was working increasingly more difficult cases, and that she was assigned as a Circuit Judge's docket attorney." ECF No. 65 at PageID.1719–20. However, Plaintiff advances no evidence except for her own testimony that APA Is were not assigned as docket attorneys. In fact, while the evidence demonstrates that APA Is were rarely docket attorneys, it also shows that there were two male APA Is who were permanent docket attorneys. Assuming Plaintiff was assigned as a docket attorney, she was not the first, nor the only, APA I to be so assigned. Plaintiff has not articulated a prima facie case of a violation of the equal protection clause or of sex discrimination under Elliott-Larsen. That is, she has not demonstrated that she was qualified to be promoted to the APA II classification or that the failure to promote her to the elevated classification gives cause to believe her sex was the reason for Defendants failure to do so. Defendants' motion for summary judgment as to Counts I and IV will be granted.

**B.**

**i.**

The Michigan Elliott-Larsen Civil Rights Act prohibits retaliation or discrimination against an individual because that person has opposed a violation of the act, made a complaint, or participated in an investigation under the act. MCL § 37.2701(a). To establish a prima facie case of ELCRA retaliation, under Count II, a plaintiff must show that: (1) he engaged in protected activity; (2) the protected activity was known to the defendant; (3) the defendant took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001); *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005). "To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett*, 628 N.W.2d at 70.

**ii.**

Plaintiff alleges that her "complaint of gender discrimination constitutes activity protected under the" ELCRA. ECF No. 1 at PageID.7. One requirement for an ELCRA retaliation claim is that Defendants knew of the protected activity before the alleged act of retaliation. Plaintiff has not identified any evidence that Defendants McColgan or Boyd, the apparent decision makers, knew of Plaintiff's meeting with HR prior to the instant case. Therefore, Plaintiff's only plausible assertion is that her informing McColgan about Boyd's behavior at the August 14 meeting was protected activity. Defendants do not appear to dispute this. The first element is met. Second, Defendants were aware of Plaintiff's suggestion to McColgan that she was mistreated because of her gender. Plaintiff reported the discrimination directly to Defendant McColgan – so he was aware

of her allegations. Also, Defendant Boyd testified he knew about Plaintiff's meeting with McColgan. As such, the second factor is satisfied. Third, Defendants terminated Plaintiff's employment, thereby satisfying the third factor. Therefore, the only factor in dispute is the causal connection between the protected activity and her termination.

Defendants argue that "Plaintiff was caught spying for Kanuszewski," "was disgruntled and openly hostile regarding the employment actions taken regarding Kanuszewski," did not follow supervisor directives, and bullied staff. ECF No. 62 at PageID.1436. Defendants argue the temporal proximity of Plaintiff's discussion with McColgan and her termination date is insufficient to establish causation. ECF No. 62 at PageID.1436. Plaintiff counters that she was never disciplined, received a severance after her termination (indicating she was not terminated for cause), and McColgan "testified he was not going to fire Clark before he learned of her gender-based discrimination complaint." ECF No. 65 at PageID.1714–15. Plaintiff does not provide any citation to McColgan's deposition testimony to substantiate this assertion.

Both parties overstate the evidence. Defendants identify no evidence of Plaintiff "spying" on office operations or disclosing confidential information to Kanuszewski. Assertions are not evidence. Defendants have only identified evidence of her informing her co-worker that their supervisor was in his office and evidence of a personal friendship between Kanuszewski and Plaintiff. There is no evidence that the APAs were informed by McColgan or Boyd they could not speak with Kanuszewski. Plaintiff testified she did not share confidential information with Kanuszewski (ECF No. 65-2 at PageID.1780) and Defendants have not identified any evidence that Plaintiff shared confidential information with Kanuszewski. Defendants have offered some evidence of Plaintiff's inability to handle major crime felony cases and that she mistreated fellow employees. However, there is no evidence that Defendants created an improvement plan with

Plaintiff, of supervisors requesting Plaintiff to minimize her interactions with certain APAs except for O'Berry, or any negative employment reviews. The close temporal proximity of Plaintiff's report of gender discrimination and the lack of disciplinary records is sufficient to establish a prima facie case of ELCRA retaliation.

The burden thus shifts back to Defendants to demonstrate that there was a "legitimate, nondiscriminatory rationale for the adverse employment action." *In re Rodriguez*, 487 F.3d at 1008. As discussed above, Defendants have not offered a legitimate rationale for Plaintiff's termination. If they were concerned with her performance in addressing the McClain case, they could have chosen to assign her to minor felony and misdemeanor cases. There is no evidence of Defendants displeasure with Plaintiff's work product prior to or after the McClain case, besides their beliefs about her attitude. The only negative testimony concerns Plaintiff bullying other employees. However, according to the Defendants, this behavior continued for months prior to Plaintiff's protected activity without consequence. *See e.g.*, ECF No. 62-14 at PageID.1511–12. Defendants have not offered a nondiscriminatory rationale for Plaintiff's termination. Defendants' motion for summary judgment as to Count II will be denied.

## C.

To establish a First Amendment Retaliation claim, Count III, a plaintiff must prove that: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by his protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006); *Evans-Marshall v. Bd. of Education of Tipp City Exempted Village School District*, 624 F.3d 332, 337 (6th Cir. 2010). If the plaintiff proves these

prima facie elements, the burden then shifts to the defendant employer to prove "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Boulton v. Swanson*, 795 F.3d 526, 531 (6th Cir. 2015). Unlike in the *McDonnel Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims. *Dye v. Office of the Racing Commission*, 72 F.3d 286, 295 (6th Cir. 2012).

### i.

The First Amendment rights of a public employee, such as Plaintiff, require "a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 88 S. Ct. 1731, 1734–35 (1995). To determine this, two questions must be addressed. *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1958 (2006). First, "whether the employee spoke as a citizen on a matter of public concern." *Id.* If so, the second question is whether the "relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.*

### ii.

The first question has two components: whether the employee spoke as a citizen and whether the language was on a matter of public concern. *Boulton v. Swanson*, 795 F.3d 526, 531–32 (6th Cir. 2015). Whether an employee spoke as a citizen depends on whether "the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 239–40 (2014). In other words, did the employee "make[] statements pursuant to [his] official duties"? *Boulton*, 795 F.3d at 532. The Supreme Court

has explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

The second component is whether the statement was on a matter of public concern. This is difficult to determine because "the boundaries of the public concern test are not well defined." *San Diego v. Roe*, 543 U.S. 77, 83 (2004). Adding to the challenge of this inquiry is that "it is hard to see how any aspect of the operation of any department of any public body could be said not to constitute a legitimate subject of public concern." *Brown v. City of Trenton,* 867 F.2d 318, 321–22 (6th Cir. 1989). The Supreme Court has held that language addresses a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) (citation omitted); *San Diego,* 543 U.S. at 84. The "content, form, and context" of the speech must be considered in making this determination. *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). "Although government effectiveness and efficiency could generally be considered a matter of public concern, we have found mere assertions of incompetence and poor management decision-making to be run-of-the-mill employment disputes–particularly when the recommended course of action would benefit the employee." *Boulton*, 795 F.3d at 532. However, "speech addresses a matter of public concern when it alleges corruption and misuse of public funds, failure to follow state law, major state policy decisions, or discrimination of some form." *Id.*

**iii.**

If Plaintiff's speech was spoken as a citizen regarding a matter of public concern, the interests of the state and employee must be balanced. Factors to consider in this determination include whether the employee's "comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994). An employer is not required to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Connick v. Myers*, 461 U.S. 138, 154 (1983); *Gillis v. Miller*, 845 F.3d 677, 688 (6th Cir. 2017) (finding that an employer's interest in maintaining a confidential investigation outweighed plaintiff's protected speech).

**iv.**

Plaintiff alleges she "engaged in constitutionally protected speech on a matter of public concern by speaking out against gender discrimination." ECF No. 1 at PageID.8. As a public employee, Plaintiff's First Amendment right to free speech only applies when she is speaking on a topic of public concern as a citizen (not an employee) and when the *Pickering* balancing test favors her. Plaintiff does not identify which comments she believes are protected in her complaint, but in her response brief, she explains "[t]he issue here is whether complaints of gender discrimination to human resources and the Prosecutor are an ordinary part of Plaintiff's duties as an APA." ECF No. 65 at PageID.1711. As a preliminary matter, there is no evidence McColgan or Boyd were aware of Plaintiff's discussion with HR prior to her termination. Accordingly, Plaintiff cannot establish a causal connection between her discussion with HR and her termination

(step three of the First Amendment retaliation test). The only possible First Amendment retaliation claim is based upon Plaintiff's complaint to McColgan after the August 14 meeting.

The first part of the First Amendment retaliation test requires a determination of whether Plaintiff engaged in constitutionally protected speech. The first inquiry asks whether Plaintiff's complaint was of a public concern. Plaintiff provides caselaw holding that complaints of racial discrimination, sexual harassment, and sex discrimination are matters of public concern. However, Plaintiff's complaint about her discussion with McColgan was how she felt embarrassed by Boyd's treatment of her as a child. However, mistreating Plaintiff as a child, without more, does not demonstrate a matter of public concern.

Even if the report of Boyd's behavior were a matter of public concern, Plaintiff was not speaking as a citizen. She reported to McColgan that she was chastised by Boyd for not listening in the August 14 meeting and her only evidence of discrimination is the fact that Boyd asked her to repeat what he said, after she volunteered that she had heard everything. Plaintiff's complaint of Boyd's behavior was made in the context of her employment as an APA. It is true that Plaintiff also alleged that she believed Boyd chastised her because she was female, but her belief about Boyd's motives, again, without more, does not meet her burden to demonstrate a prima facie case of First Amendment protected conduct. Accordingly, Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claim, Count III, will be granted.

**D.**

In Count V, Plaintiff alleges "Discrimination against Defendants Saginaw Under the Equal Pay Act [EPA], 29 USC § 206(d)."

**i.**

29 U.S.C. 2056(d)(1) provides

> No employer having employees subject to any provisions of this section shall discriminate, . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: . . .

A prima facie case of wage discrimination under the EPA requires a plaintiff to "show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (citing 29 U.S.C. § 206(d)(1))). Affirmative defenses that justify a different salary include the assertion that the employer utilized systems based on seniority, merit, or which measures earnings by quantity or quality of production. 29 U.S.C. § 206(d)(1). In addition, an employer meets its burden if it demonstrates the decision was motivated by any factor other than gender. *Id.* At the summary judgment stage, "the employer must prove that sex provides no part of the basis for the wage differential." *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005) (abrogated by *Fox v. Vice*, 563 U.S. 826 (2011) on separate question of compensation for frivolous claims).

### ii.

In her complaint Plaintiff alleges that "she was promoted to APA II and given job duties, however, she was not paid commensurate with the position, such as similarly situated male APA's were paid. [ ] Had Plaintiff been paid a wage equal to that of the male employees who performed equal work to the work she performed, she would have been paid at a higher rate." ECF No. 1 at PageID.10–11. Plaintiff has scant evidence that she was paid at an APA I scale after being promoted to an APA II. First, she argues that two APA I male employees had APA II PCN classifications and were paid at the APA II level without actually being promoted to APA II. Of

the two APAs who were paid at the APA II level while retaining their APA I positions, one was a botched attempt to provide a bonus and the evidence is unclear as to APA Reimer's PCN status at the time of his promotion. This is not evidence of APA IIs being paid at an APA I rate, as Plaintiff alleges occurred with her. Even if it were, Plaintiff does not demonstrate that she was ever promoted to APA II. Second, she argues that only one male APA I was reclassified as an APA II without a commensurate pay increase. Plaintiff is correct that the fact that one male APA was treated the same as her does not necessarily undermine her complaint. However, she provides no evidence of how this fact supports her case.

According to the collective bargaining agreement, Plaintiff should be moving in lockstep compensation under Section 9.3 except for promotions. This is where Defendants' lack of an explanation about compensation makes little sense. There is no explanation for the assignment of APAs to the classifications or for deviating from Section 9.3. However, Plaintiff provides no evidence of how the compensation she received was less than males who were performing the same employment tasks as she was. Plaintiff has not furnished persuasive evidence that she was actually promoted to APA II during her employment. She also has not demonstrated that a male APA I was paid more than her except for the two exceptions noted previously. Plaintiff's belief that she was promoted because her PCN number changed and the fact that she was assigned as a docket attorney is insufficient to demonstrate that she was, in fact, promoted. She is not the only APA I to have her PCN "moved" to APA II while her compensation remained at APA I level. She is also not the only attorney who worked as an assigned docket attorney while receiving APA I compensation. Plaintiff has failed to demonstrate a prima facie case that she performed equal work as compared to individuals who were APA Is but compensated at the APA II pay scale. Therefore, Defendants' motion for summary judgment on Count V will be granted.

## III.

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No.

62, is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts I, III, IV, and V are **DISMISSED**.

It is further **ORDERED** that Defendants County of Saginaw and Saginaw County

Prosecuting Attorney's Office are **DISMISSED**.

Dated: September 29, 2020                                    s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge